In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-06-024 CV


____________________



CAROLYN TALMORE, VERONICA LESLIE AND 


AGNES TALMORE, B/N/F CAROLYN TALMORE, Appellants



V.



BAPTIST HOSPITALS OF SOUTHEAST TEXAS, D/B/A MEMORIAL 


HERMANN BAPTIST HOSPITAL, DR. KESHAVA CHERUKU REDDY,


DR. ROBERT KRAMER AND DR. HERVY HARRISON HINER, JR., Appellees





On Appeal from the 172nd District Court


Jefferson County, Texas


Trial Cause No. E-175010






MEMORANDUM OPINION



 Veronica Leslie and Carolyn Talmore, individually and as next friend of Agnes
Talmore, (1) filed a healthcare liability suit against Dr. Keshava Cheruku Reddy, Dr. Robert
Kramer, Dr. Hervy Harrison Hiner, Jr., and Baptist Hospitals of Southeast Texas. The
plaintiffs challenged the trial court's dismissal of their suit brought under Chapter 74 of the
Texas Civil Practice & Remedies Code. Finding no abuse of discretion, we affirm the trial
court's judgment.

The Statute


 Plaintiffs who assert a healthcare liability claim in Texas must provide each defendant
physician and healthcare provider with an expert report. See Tex. Civ. Prac. & Rem. Code
Ann. § 74.351(a) (Vernon Supp. 2006). The statute defines "expert report" as follows:

 a written report by an expert that provides a fair summary of the expert's
opinions as of the date of the report regarding applicable standards of care, the
manner in which the care rendered by the physician or health care provider
failed to meet the standards, and the causal relationship between that failure
and the injury, harm, or damages claimed. 


Tex. Civ. Prac. & Rem. Code Ann. § 74.351(r)(6) (Vernon Supp. 2006). The report "must
discuss the standard of care, breach, and causation with sufficient specificity to inform the
defendant of the conduct the plaintiff has called into question and to provide a basis for the
trial court to conclude that the claims have merit." Am. Transitional Care Ctrs. of Tex., Inc.
v. Palacios, 46 S.W.3d 873, 875 (Tex. 2001); see also Jernigan v. Langley, 195 S.W.3d 91,
93 (Tex. 2006). The trial court's inquiry is limited to the four corners of the report. Bowie
Mem'l Hosp. v. Wright, 79 S.W.3d 48, 53 (Tex. 2002) (citing Palacios, 46 S.W.3d at 878). 
Although an expert does not need to marshal all the evidence, a report that omits any of the
statutory elements is not a good-faith effort, and a report merely stating that the expert knows
the standard of care and concludes it was not met is insufficient. Palacios, 46 S.W.3d at 878,
880 (quoting Chopra v. Hawryluk, 892 S.W.2d 229, 233 (Tex. App.--El Paso 1995, writ
denied)). 

 As permitted by statute, Baptist and the defendant physicians filed motions objecting
to the reports. See Tex. Civ. Prac. & Rem. Code Ann. § 74.351(l) (Vernon Supp. 2006). 
Plaintiffs did not file a written response, although they challenged defendants' objections at
the hearing on the motion to dismiss. The trial court concluded the reports were not adequate
and dismissed the plaintiffs' claims. We review a trial court's decision regarding the
adequacy of an expert report under an abuse of discretion standard. Palacios, 46 S.W.3d at
878. "A trial court abuses its discretion if it acts in an arbitrary or unreasonable manner
without reference to any guiding rules or principles." Bowie Mem'l Hosp., 79 S.W.3d at 52. 
The Expert Reports


 Plaintiffs submitted expert reports from Dr. Mark Levinson and Nurse Practitioner
Lisa Lindsay. (2) The reports describe Agnes Talmore's medical condition. She had chest
discomfort and was admitted to Baptist on February 7, 2003. Her pre-admission history
revealed she had pre-existing conditions of hypertension, congestive heart failure, diabetes,
and an abdominal aortic aneurysm. Talmore underwent cardiac catheterization and coronary
artery bypass surgery that same day. On February 8, two more procedures were performed
on Talmore. First, she was operated on for "excessive mediastinal drainage" and removal
of a blood clot in the heart. Second, blood clots were removed during emergency exploration
of the right femoral, popliteal arteries. On February 9, defendant Dr. Kramer, an orthopedic
surgeon, performed a right leg fasciotomy to relieve the "compartment syndrome of the right
leg." 

 Talmore developed renal failure and had to have dialysis. She was under the care of
defendant Dr. Hiner, a nephrologist, for this condition. 

 Talmore received numerous transfusions of packed red blood cells. On February 14,
she was transferred to rehabilitation. There, another physician evaluated Talmore, who was 
complaining of shortness of breath and chest pain. Concerned about "possible sepsis and/or
pneumonia[,]" the doctor expressed reservations about Talmore's ability to participate in
rehabilitation and recommended she be transferred to the emergency room. Talmore was 
re-admitted to Baptist on February 15. Dr. Levinson's report states a chest x-ray showed
"bilateral pleural effusions . . . consistent with congestive heart failure." Talmore's white
blood cell count was 17,000, hemoglobin was 9, and hematocrit was 26. 

 At some point during her stay, defendant Dr. Reddy, an infectious disease specialist, 
saw Talmore in consultation concerning her right leg wound. Dr. Reddy recommended
intravenous antibiotics and clinical monitoring of the leg.

 A gastroenterologist believed Talmore was having an upper GI bleed and
recommended aggressive medical management. Levinson's report states that by February
20, Talmore's hematocrit had stabilized and "it was felt" she no longer had a GI bleed. The
gastroenterologist indicated that if Talmore "continued to need transfusion[s] . . .," "she
would need to have EGD." However, because of Talmore's "poor respiratory status[,]" a
pulmonologist concluded an EGD was too risky. 

 At some point, Talmore had another myocardial infarction. Her hematrocrit dropped
to 26.6, and hemoglobin was at 9.1. The leg wound became infected with vancomycin
resistant enteroccus. On February 24, she was discharged home with a hemoglobin count of
8.7 and hematocrit of 25.4. 

 On February 28, emergency medical services brought Talmore back to the emergency
room after she suffered a cardiopulmonary arrest at home. At the time of admission, her
hemoglobin was 5.3 with a hematocrit of 15.8. Dr. Levinson's report states as follows:

 A CT Scan of the abdomen and pelvis showed . . . a persistent density
identified in the left abdomen that extends along the left flank into the pelvis
suspicious for a prominent hematoma. This could have been from the rupture
of an abdominal aortic aneurysm or retroperitoneal hematoma. 


Talmore died at the hospital on February 28, 2003. 

 Dr. Levinson's report sets out the following as the standard of care and indicates the
standard is the same for the hospital and each physician:

 1. To "properly and expeditiously evaluate [Talmore's] progressive anemia"
with a "CT Scan over the abdomen looking for leakage from a known
a[bd]ominal aortic aneurysm or retroperitoneal hematoma."

 2. To not discharge her with "failing" hemoglobin, hematocrit, and with a
known diagnosis of an abdominal aortic aneurysm and possible retroperitoneal
bleed.

 3. To not discharge her if she was unresponsive, had pneumonia, a GI bleed,
a high white blood cell count, fever, and an active infection VRE in the right
leg wound. 

 4. To not transfer her to a general medical floor or a telemetry unit to start
physical therapy if she could not get out of bed.

 

 Dr. Levinson asserts the defendants breached each of these standards of care and then
sets out the causal relationship (3) between the failure to meet these standards and the injuries
leading to Talmore's death: 

 As a direct result of the departure of the above Standard of Care, Ms. Agnes
Talmore became weakened and lethargic and as a direct and proximate cause,
sustained a cardiac pulmonary arrest due to the profound anemia and
hemorrhaging. This injury resulted in her death.


 Dr. Levinson and Nurse Practitioner Lindsay also set out the standard of care for the
prevention and treatment of bedsores. For Baptist and the nursing staff caring for Talmore,
that meant "turn[ing] her and reposition[ing] her every two (2) hours or provid[ing] adequate
skin care." Both expert reports state Baptist breached this standard and then explain the
causal relationship between the breaches of the care standard and the presence of decubitus
ulcers:

 As a result of the departure of the Standard of Care, [Talmore] developed
Stage II [d]ecubitus ulcers on her buttocks and skin tears and necrotic tissue
with yellow slough. This is completely an unacceptable departure of the
Standard of Care for someone hospitalized for such a short term.


 As a direct result of this departure from this Standard of Care, [Talmore]
undoubtedly suffered great pain, suffering and mental anguish.


Baptist and the defendant physicians challenged the experts' statements of the standards of
care, breaches of the standards, and causation. 

 Although each of the doctors the plaintiffs sued is a specialist, Dr. Levinson's report
relies on a general standard of care and does not identify the duties owed, or the specialities
practiced by, each physician; nor does the report set out the standard of care for each
specialty. At least eight physicians, including a cardiologist, pulmonologist,
gastroenterologist, orthopedist, nephrologist, and infectious disease specialist, were involved
in Talmore's treatment. Three specialists, Dr. Kramer (orthopedics), Dr. Reddy (infectious
disease), and Dr. Hiner (nephrology) are sued here.

 Dr. Levinson assumes the physicians sued are equally responsible for all care and all
treatment of Talmore during her hospitalization, but the assumption must have some
foundation and explanation. The physicians were not treating Talmore for a single problem. 
In addition to the pre-existing conditions of diabetes, hypertension, congestive heart failure,
and abdominal aortic aneurysm, Talmore developed complications in the hospital, and each
physician had an area of expertise that he or she was called upon to apply to the specific
conditions. A report may not simply assert that multiple defendants are all negligent for
failing to meet the standard of care without explaining how each defendant specifically
breached the standard and how that breach caused or contributed to the cause of the injury
or death. See Taylor v. Christus Spohn Health Sys. Corp., 169 S.W.3d 241, 244 (Tex. App.--Corpus Christi 2004, no pet.); Wood v. Tice, 988 S.W.2d 829, 831 (Tex. App.--San Antonio
1999, pet. denied) ("The report must specifically refer to the defendant and discuss how that
defendant breached the applicable standard of care."). The report should have included
specific details regarding the responsibilities of each physician treating Talmore. In omitting
these details, the report lacked specificity as to the standard of care applicable to the
treatment and care provided by each of the specialists consulted in the case. See Taylor, 169
S.W.3d at 245; Rittmer v. Garza, 65 S.W.3d 718, 723 (Tex. App.--Houston [14th Dist.] 2001,
no pet.).

 The trial court reasonably may have concluded the defendant physicians cannot be
said to have breached the standard of care when (a) no standard of care is set out for each
specialty consult, and (b) as to the transfer and discharge, the report does not identify who
ordered the transfer and later the discharge. Given that the reports indicate Talmore's
hospitalization involved various medical complications, and she was treated by at least eight
physicians, the trial court could reasonably conclude the reports did not comply with the
statute, because they failed to adequately state the duty or the standard of care applicable to
each defendant. 

 Dr. Levinson's report also states the causation element: because of the breaches of the
standard of care, Talmore became "weakened and lethargic" and "as a direct and proximate
cause," sustained a "cardiac pulmonary arrest." The trial court reasonably may have
concluded the report did not adequately explain the cause of the pulmonary arrest; the report
does not link sufficient facts concerning each defendant specialist's treatment to the report's
conclusion. At one point Ms. Talmore's hemoglobin was 9, later 9.1, and then 8.7 at her
discharge from Baptist on February 24. Upon emergency re-admission on February 28,
Talmore's hemoglobin level was 5.3. Given Talmore's pre-existing conditions and
complications developed in the hospital after bypass surgery, the report does not explain
what treatment within the defendants' specialties would have been appropriate, or even
which treatment should have been done by these specific physicians had a CAT scan of the
abdomen been performed prior to the February 24 discharge from the hospital. As we have
noted, Talmore was under the care of other physicians who were treating the identified
condition within their areas of specialization. Although the report indicates those
consultations directly related to Talmore's medical condition and resulted in her injury and
death, Dr. Levinson does not explain the causation relationship between each defendant's
specific treatment of other conditions, the hemoglobin levels, the failure to do a CAT scan
prior to discharge, the prior existence of an abdominal aortic aneurysm, and Talmore's
cardiac pulmonary arrest on February 28. 

 The reports of Dr. Levinson and Nurse Practitioner Lindsay (4)
 state that Talmore 
developed Stage II bedsores during her hospitalization. The reports set out the standard of
care: Talmore should be turned every two hours or be provided with adequate skin care. 
Both Lindsay and Levinson assert neither was done, and as a result, Talmore developed
bedsores and suffered great pain. 

 Other than the statement of the need to turn Talmore every two hours and the need for
adequate skin care, the reports offer no specific explanation of how Talmore's multiple
medical problems impacted the development and treatment of the ulcers; and there is no
description of an appropriate skin care program to prevent and treat bedsores or to keep them
from progressing to a more serious level. The trial court may have concluded Dr. Levinson's
report did not explain causation adequately; his report simply concludes causation exists. 
The application of the expert report requirements to Baptist Hospital is a close question in
this case. Nevertheless, in considering the rather conclusory statement of the care standard,
description of the breach, and causation statement, the trial court, within its discretion, may
reasonably have found one or all cursory and inadequate. 

Conclusion


 The trial court did not abuse its discretion in finding the expert reports inadequate. 
Plaintiffs' issues are overruled. The trial court's dismissal of the suit is affirmed.

 AFFIRMED.

 _________________________________

 DAVID GAULTNEY

 Justice

 

Submitted on July 27, 2006

Opinion Delivered October 12, 2006


Before Gaultney, Kreger and Horton, J.J.
1. Plaintiffs Veronica Leslie and Carolyn Talmore pled that they are the children and
heirs of Agnes Talmore.
2. Both experts submitted two reports. Lindsay's supplemental report was identical to
Dr. Levinson's supplemental report. 
3. Under section 74.403, only a physician may qualify as an expert witness on the causal
relationship element in a suit involving a healthcare liability claim against a physician or
healthcare provider, unless the claim is against a podiatrist or dentist. Tex. Civ. Prac. &
Rem. Code Ann. § 74.403 (Vernon 2005).
4. Nurse Practitioner Lindsay also states Baptist and the medical personnel involved
released Talmore prematurely on February 14 to the cardiac rehab unit and prematurely
discharged her home on February 24. Although qualified by education, experience, or
training, to express an opinion about the nursing standard of care during Talmore's
hospitalization at Baptist, Nurse Practitioner Lindsay is disqualified by statute as an expert
witness on causation in this case. See Tex. Occ. Code Ann. § 301.002(2) (Vernon Supp.
2006); Tex. Civ. Prac. & Rem. Code Ann. § 74.403 (Vernon 2005). Specifically, under the
circumstances of this case she could not offer an opinion that any breach of a standard of
medical care was a cause of Talmore's injuries and death.